Good afternoon, Illinois Appellate Court, 1st District Court is now in session. The 6th Division, the Honorable Justice Sanjay T. Taylor presiding, case number 24-0193, People v. Martinez, Steigvila. Good afternoon. My name is Sanjay Taylor. I'm the presiding judge of the 1st of the 6th Division of the 1st District Appellate Court. I'm joined by my colleagues, Justice Michael B. Hyman and Justice Carly Walker. If I can ask counsel to introduce themselves. But first, I will tell you, each side will have 20 minutes and counsel for Appellant, if you could let me know how much of the 20 minutes you would like to reserve for rebuttal. So, counsel for Appellant first. Good afternoon, Your Honor. Matthew Madden on behalf of Mr. Steigvila. Judge, if I could reserve five minutes for rebuttal. Thank you. Mr. Madden and counsel for Appellate. Rita Stutz from the State's Attorney's Office for the People. Okay. Good afternoon, Ms. Stutz. Mr. Madden, you may proceed. Thank you, Judge. May it please the court. Your Honors, what happened in this case was an undeniable tragedy. A young man is dead for absolutely no reason. And the acts of Martinez-Steigvila was the cause of that senseless death. However, no matter how tragic it is, no matter how senseless it was, under Illinois law, if this scenario fits into any category of homicide, it is reckless acts of involuntary manslaughter, not knowing first degree murder. Obviously, there is a significant difference in the mental state required for first degree murder, as opposed to involuntary manslaughter. Your Honors, this argument is pretty simple and straightforward. It's simply there was not sufficient evidence to convict Mr. Steigvila of first degree murder, specifically as to intent, and most importantly, as to knowledge. Well, isn't it true that knowledge is a question of inference? Well, I don't think it is, Judge. Judging by the nature of the injury. Judge, I think it could be, but it has to be inferred by the surrounding circumstances. Well, then we have a surrounding circumstance. You say that there was up to five punches. Five punches. We have testimony from two people that his nose started bleeding immediately after the first punch, and his eyes rolled back after the second. And he continued punching the guy. Third, he surprised him. He punched him from the side, and the victim didn't see it coming. Your Honor, with all due respect, I wouldn't agree as to... First of all, I think it's between two and four punches. Well, your brief says otherwise. I don't... The five from your brief. You wrote that. Well, Judge, it's... The testimony asked to the number was inconsistent at trial. Okay, but so you say your brief says it could have been up to five. Yeah, Judge, like I said, it is inconsistent. It was inconsistent at trial. Where's the inconsistency? One said two. One said four. So there are several punches, but you said five. So, you know, that's your brief. So, you know, there are multiple punches, and it doesn't matter if there were two, three, four, five. By the second one, his eyes were rolling back in his head. Okay. And, Judge, if I could respond specifically to that, there is... Well, if I could just... You mentioned they snuck up on him, Judge. I also think that's inconsistent. The trial court certainly made that finding. However, the trial court ignored Miss... One of the witnesses, Miss Barnett, specifically said he approached him and said, You want to laugh at that? You think that's funny? You think he came at him angrily with words before it? So I'm not sure that's fairly put as he snuck up on him. You know, as if, you know, a cloak of invisibility. I don't think that's what happened. Did the victim ever put up his fists? Did the victim say anything? Did the victim... The first punch was on the side of the head, wasn't it? That appears to be true, Judge. I know it does not... There's no evidence that the victim said anything or put his hands up or anything along those lines. This is a... It was described in the briefs as a sucker punch. I didn't describe it as a sucker punch. No, you didn't. And the court, you're right. The trial court did describe it that way. But I think that ignores that, according to Miss Barnett, he confronted him with words before he threw a punch. That doesn't mean it wasn't... You can have words and still surprise somebody with a punch. Those words don't say... He didn't say, I'm going to hit you. He didn't say, get ready. Let's have a fight. You're picking a fight with me. No. So it's still... You can have words. That doesn't mean... It came out of nowhere. Judge, that's certainly open to the court's interpretation. My point is... It's not our interpretation. The judge is the trier of fact. Don't we have to... Well, the... We're not here to reweigh the evidence. Well, my position is that if there were words before it happened, I'm not sure that's fair to say that it was a complete surprise. He was yelling at him angrily before he did it. Again, that's no justification whatsoever. That's just saying there was words before it actually happened. Judge, as to the... How rapid this thing happened. Okay, so Your Honor asked... Essentially, you know, he had a bloody nose and he had... And his eyes rolled back. Judge, whatever the number was, whether it was 2, 3, 4, 5, okay? The one thing the witnesses were consistent on was that the blows were in very rapid succession. The whole thing is over, according to everyone, in a matter of seconds. You know, we're talking potentially, you know, milliseconds between blows. Why is it over? Well, that was the testimony of all eyewitnesses. No, no, no. I'm asking a question I know the answer to. What caused it to be over? The... One of the other witnesses tackled Mr. Stibuli. His friend, Garza, tackled him. Right. Otherwise, he was not stopping. Well, we don't know that, Judge. Well, we do know because he kept punching him and then he tackled him and that's when it stopped. That was a testimony. I mean, he was tackled. Well, Judge, this whole incident, according to everyone, happened in a matter of seconds, okay? A murder happens in a matter of seconds. Well, it was, you know, it was not a step-by-step, drawn-out process with a new-founded opportunity for analysis and evaluation between punches. I think that's just an unrealistic way to look at the incident, what happened here. But, Mr. Madden, the question for us really is whether or not a reasonable trier of fact could have found that the axe created a strong probability of death or great bodily harm. That's really the question for us, correct? Correct. Okay, so now let's address, I know you and Justice Hyman have been having a great conversation here, but let's address that question. Well, okay, Judge. So, it is, you know, it is, the appellate courts have laid out what's required to prove knowledge for purposes of first-degree murder, okay? And so, a reasonable trier of fact would have had to satisfy that element. In People v. Jones, the court stated that a knowing murder conviction requires that proof that a defendant was, quote, consciously aware that his conduct is practically certain to cause a particular result. Namely, that particular result being death or great bodily harm. You know, the standard's not maybe it could cause great bodily harm or it's deemed reckless because it might cause great bodily harm. That's not enough. The statute says strong probability. That's why I was reading from the statute earlier also when I asked my question. The statute says strong probability. But again, our standard is a little bit different from the trial court. The trial court needed to determine, you know, reasonable doubt of whether or not there's reasonable doubt that he committed the act. But here, we have to ask ourselves, weighing all the evidence in favorable to the state, whether or not a reasonable trier of fact could have found that the acts created a strong probability of death or great bodily harm. And that's the statute. Create a strong probability of death or great bodily harm. And now so I'm asking you these five punches. First two we know were pretty severe. The nose bleed and then the eyes roll in the back of the head. And then there were and I'll stick with where you want to be. I think that there were probably two more punches afterwards, even though your brief does say five. We'll assume that there were only two. So does that get us where does that leave us as a reviewing court? Because remember, we're not we're not looking at this the same way that the trier of fact did the trier of fact had one job. Our job is to now weigh all the evidence in favorable to the state in the most favorable to the state and then ask could a reasonable trier of fact could have made that fine. OK, well, judge, in answering that, I think it's necessary to to talk about the kind of the bare fist principle, as I would put it, as the courts have put it, which which the trial court, frankly, seem to kind of ignore. In the state's briefs, you know, there is kind of a tone that Mr. Stabile has invented this idea. He didn't invent it. It's been a well-established principle in Illinois law for decades. And the principle has its basis in common sense. It's that death is not contemplated as a natural consequence of blows from bare fist. And I would note that language case said that it's not contemplated Jones. The quote from Jones is death is not contemplated as a natural consequence of blows, plural blows from bare fist. Does that Mr. Madden apply to the head as well? Judge, I believe. Well, I, I, I, I haven't seen anything saying it doesn't judge that certainly. So, yeah, I believe it does. Indeed, the countless number of bare fist punches, you know, the common sense presumptions that most, if any, will not end in death or great bodily harm, much less a conscious. Many cases have been cited in the record that show punches where the defendant's convictions were upheld for murder. Well, typically, that doesn't really go very far. It seemed to me that not only that, your client said on a cell phone video, when I get mad, I start swinging. So he knows. And that was apparently after this happened. He knew he has a bad temper. He knew he comes out swinging. He knew what was going to happen. And this is a very strong man. Apparently, you know, he was arm wrestling before this. He was prepped up and he knew when he gets angry, he goes and starts swinging. Well, Judge, as to the cases that you mentioned that where punches were found to be first degree murder, virtually all of them, if not every single one of them, because the court found they fell into an exception to the bare, the bare fist principle. There's two primary exceptions to the bare fist principle. One, if there's a size or strength disparity between the victim and the defendant. And two, what I refer to as the exceptional prolonged violence exception. Neither exception applies to the facts of this case. First, there is no drastic size strength difference between the victim and Mr. Stabila. In fact, it was the opposite. Mr. Stabila was notably the smaller of the two. The evidence was that the victim was six foot one, 200 pounds. Mr. Stabila was five foot seven, 185 pounds. The disparity in size and strength did not favor Mr. Stabila. Some of the examples were the courts. Those exceptions don't cover everything. And in this case, it was, as Justice Walker said, it was an internal decapitation. And that happened in either two, three or four punches. That is quite an achievement. Okay. And when you look at everything else I've stated, what we're talking about still is his intent. What was he thinking and what people saw? And, you know, he went ahead and he did this knowing his strengths and knowing that the victim was not prepared for this. You know, in some of these cases, it goes on a long time, just because he connected right away, over and over and over. You think that means that statute doesn't apply? I mean, I don't understand your argument that we have to follow the statute. Well, Judge, it didn't seem to me that the trial court really relied on intent as much as knowledge, because it was the knowledge that it would result in severe bodily injury. But, Judge, I think unless I'm not aware of another exception besides the two that I've mentioned, nor am I aware of a case with bare fists that was found to be first degree murder that doesn't fit into one of those exceptions. I don't think there is such a thing. I mean, when you say exceptions, I mean, this is not a rule of law. This came about from a case over 100 years ago. And actually, people are stronger today than they were back then. And this isn't something we have to follow the statute, as Justice Walker said. And so that's what we're looking at. Judge, just to comment on a comment by the court, I don't know that there's anything in the record that Mr. Stabile would know anything about how hard he throws a punch. This is not a boxer or an MMA fighter or any history. Oh, but he's an arm wrestler, and he arm wrestled. Apparently, they arm wrestled before, according to the testimony. And so they arm wrestled. And he knows he has a temper. Well, he's an arm wrestler in a kitchen at two in the morning, Judge. Doesn't matter what he's doing. Dr. Madden, let me ask you, you know, it seems to me that your argument really is that under the bare fist principle, you know, the first punch, he could not have reasonably known that it would have caused great bodily injury. And your argument is that because the remaining punches, whether it's, you know, two, three, four, five, whatever the number is, because they were in such rapid successions, that your client had no opportunity or reason to gauge what effect each blow to the head had on the victim. And therefore, he didn't have the knowledge that what he was doing could cause great bodily injury. I mean, that seems to be what your argument really comes down to. Am I correct? Judge, yes, I do think that's correct, because knowledge has to come in beyond a reasonable doubt at some point. Knowledge needs to be satisfied at some point. And if that, and we've only got a few seconds to satisfy it. So it just isn't. Is there any argument, was there any argument that alcohol may have played a factor in what your client knew at the time he was striking the victim? Judge, there was, I was not trial counsel, Your Honor. So I, but I do know that it was mentioned as the court specifically mentioned it. I believe at the trial and I believe that the post-trial motions that everyone was drinking and that could have played a part. But Judge, I think what, yes, I think you're right on it. It is, knowledge needs to be satisfied at some point that, okay, this is a reasonable, or a, this is the next step. And I don't think it was in this case. And because the second exception, which I hadn't talked about yet, it really contemplates prolonged beatings, which this wasn't. You know, the evidence in this case of, you know, two, three, four, five blows in a matter of, everyone said it was under 10 seconds. You know, they were, that just did not allow for the time for him to say, okay, typically what happens in these cases with this exception, and the government points to the Axtell case as, you know, comparing this to that. Judge, the Axtell case is a man knocked a woman unconscious, waited for her to come to, then later on in the day, knocked her out again and delivered the fatal blow. This is nothing like Axtell. This is nothing like any of the cases where the court found. This is more like, you would say this is more like when, yeah, right, where the father, I'm sorry, the son apparently was a caregiver for the father, punched the father. Even that case was a little bit different because in that case, the son actually called an ambulance and so forth. I believe he waited for the ambulance to come and subsequently left and the father subsequently died in the hospital after a few days. But I believe he died of a stroke in that case. Are you familiar with the case? I am, Judge, and you took the words out of my mouth. Part of the argument is that out of all the cases cited, the one that I think is actually closest factually is Lanyo, in which the court found that there was insufficient evidence for first degree murder. I would agree with that. Do you know who the author was of that case? I do not, Judge. I hope it's not you. No, it was me. And this case is extremely different because in that case, we decided, and I remember that case quite well, and I did reread it after I saw it in your briefs. He died from a stroke and he had high blood pressure and other medical conditions, and that was the cause of death. So there was a big difference between that case and this case. So it's interesting that you would rely strongly on that one. Tell us how you believe they're the same, though. I appreciate Justice Hyman's comments, but tell us why you believe they're the same. Well, in that case, Lanyo was four to five punches. They were found to be of similar size. It lasted a few minutes, whereas this one was far less than that, a few seconds. While it's certainly, Justice Hyman, it's certainly an imperfect comparison, and I know that there was a stroke involved in the other one, there was this underlying AVM condition here, which, and if I could just get to that briefly, the state seems to say that the AVM malformation in the victim now had no role in the death. How can they possibly say that? That seems to be cherry-picking what they like from their own medical expert versus what's inconvenient for their theory. The fact is, the state's own expert presented evidence at trial that the victim suffered from an underlying health condition, AVM, that hemorrhaged and contributed to the bleeding on the brain, as opposed to if he did not have an underlying condition. But that has nothing to do with the fact that he incapacitated the head. Well, no, that is true, Judge. But you can't just totally throw it out and say, well, the bleeding… It happened quickly. That doesn't get your client off the hook. In fact, it shows maybe he really wanted this guy finished. I mean, why would you hit him so fast, if it was what you say? I agree. I mean, you're right. It did not have anything to do with the neck injuries. But one of the conclusions was that he died of cerebral edema. And the edema is caused by the hemorrhaging of the AVM. So I don't think it's just irrelevant to the analysis. But one of the issues, Your Honors, is that it doesn't fall into any exception. And again, I haven't seen any case where someone was found with bare fists to be first-degree murderer where it didn't fall into one of those exceptions. This one doesn't. The trial court… Madden, your time is up. So I'm going to turn to the state, and then you'll have five minutes in rebuttal. Thank you. Ms. Stutz. Thank you, Your Honor. If I could just start with a couple of the factual issues. Starting with the AVM, there was no evidence that that was a cause of death. That was just one of the many places in the victim's brain that was bleeding. And I don't know of anything that says he died of cerebral edema. The ME testified that several of the injuries could have been fatal on their own, but one of them was definitely fatal on its own. And that was the laceration of the atlantocipital membrane connecting the skull to the spine. Ms. Stutz, if you could address Mr. Madden's main argument, which is that regardless of how many punches there were, there's a debate about whether it's two, three, four, or five. They were in such rapid succession and so quickly, only 10 seconds, according to the evidence of trial, that no reasonable fact finder could have concluded under those circumstances that the defendant knew that his punches would inflict great bodily harm upon the victim. We know that can't be right based on Nyla Barnett's testimony. She's the one who testified about what happened after each punch. Punch number one, nosebleed. Punch number two, eyes roll back in the head. The victim starts to collapse. If she saw those things, then the defendant certainly did. He had to be looking right at the victim. He was landing punch after punch directly on his head. If he saw those things, he was on notice. But Ms. Stutz, he was actually standing to the side of him. So it's possible that he didn't see all of that. So I think what Mr. Madden is arguing is that at some point, we've got to find that there was knowledge. We realize that maybe that first punch that caused the nosebleed, we know for sure that he was standing to his side. And maybe he didn't have knowledge that these acts would ultimately create that strong probability of death or great bodily harm, of course. I don't think I've been saying great bodily harm because of his death here. But even if it's great bodily harm, it still creates an issue. And then the second punch also, was there time then, was there enough time to pass? And I think this is where Justice Taylor is going. Was there enough time to pass to be able for that finding to be made that there was knowledge? And then, as suggested, all of it happened within 10 seconds. Is that still enough time for us to find that there was knowledge that these acts were going to create that strong probability of death or great bodily harm? And that's kind of where the struggle is, I think. And just to piggyback on that, we can say maybe there was, perhaps more probably true than not there was. But can we say beyond a reasonable doubt? Can anyone say on this record beyond a reasonable doubt that the defendant had knowledge? Well, just to clarify there, reasonable doubt's the question for the fact finder. This court has a slightly different question, and it has to do something the fact finder didn't do, which is take all the evidence in the light most favorable to the state. So we view Barnett's testimony as to what was happening with the victim after each punch, and it's a reasonable inference that defendant would see that. It was a rapid succession of punches, but we know there was enough time for four or five punches. We also know that the defendant did not stop until he was physically restrained by being tackled. We know he was angry. We know he used extreme force comparable to a car accident, and that he hit the victim hard enough to decapitate him. Looking at all of that, and we also know, of course, he blindsided the victim intentionally in order to inflict the maximum possible injury. So this victim was especially vulnerable. I know there is evidence in the record that he said something as he was approaching. Well, is it blindsided or, you know, Justice Hyman, you sucker punched, but Mr. Madden points out that he came up to him, the defendant came up to the victim and said, you think that's funny. So presumably they were looking at each other. One can still be sucker punched, you know, in that scenario, but presumably they were looking at each other. I don't think they were looking at each other, especially viewing the evidence in the light most favorable to the state. My recollection is that Garza testified that the defendant did not say anything. Barnett testified that he made a comment like, oh, you want to laugh about this video you took. But I believe the testimony was undisputed that the victim was not facing the defendant. He was not looking at the defendant when this happened. So it was a sucker punch, a series of sucker punches. He never made any response at all to the punches. He had no. A sucker punch is simply an unexpected punch. It doesn't mean that you don't see it coming. OK, then I'm using the then it's worse than a sucker punch. It's a sucker punch. He didn't see coming at all. He wasn't looking according to the evidence in the record. He was not facing or looking at the defendant. He was doing something else and caught unaware. At the very least, that is a reasonable reading of the evidence in the light most favorable to the people. But what what what about the incident gets us to? And I know I'm asking the same question because I don't feel like I have an answer to it yet. What gets us to knowledge? Help me with that. What actually gets us to that? The defendant had knowledge that the acts would call. There's a great probability they would call great bodily harm or death. How do we get to the knowledge? Because there was nothing said. So how do we get there? Viewing evidence in the light most favorable to the state, it's a reasonable inference. The defendant saw what he was doing. He saw the victim start bleeding. He saw his eyes roll back in his head. He saw him collapse and he continued punching until he was physically restrained. You just said you don't think they were facing each other. I think when you answer just Taylor's question a moment ago, you said they weren't. So how do you know that he saw his eyes? Well, he saw all the stuff that you say you saw. The. He he certainly saw the victim start to collapse. He he certainly knew the victim wasn't responding in any way to his punches. He didn't put it after that would have been after the and I'll just stick with the four since I think that's what everybody's comfortable with, even though there's some evidence that there may have been five. But that was after the four punches. So at that point, he had already the act had already been committed. So at what point does the knowledge come in, though? I think the evidence has actually started to collapse after the second punch. But the evidence is clear throughout. He did not respond to a single punch. So that would have put the defendant on notice to he's punching him. The defendant's not making any effort to defend himself. He's not responding in any way. He's severely injuring the victim. And he knows that. Was the victim at some point did the victim fall to the ground? Yes. When Garza, I believe, testified that. I'm sorry, I believe Barnett testified it was after the second punch that he started to collapse. And then where was he where was the victim at the third and fourth punches? I believe Garza testified that defendant was delivering the third and fourth punches as he was tackling them. So I'm assuming possibly they're both in the process of going to the ground. But certainly in any case, he he's punching them until he's physically restrained, extreme force comparable to a car accident, blindsiding the victim when he wasn't paying attention and severe signs of injury that are obvious. And then, of course, he doesn't render aid. He flees the country. All of that is sufficient to prove that he knew his actions created a strong probability of great bodily harm. Well, there's a fact that he fled the country. I'm sorry. No, that's OK. Go ahead. Does the fact that he fled the country, is that evidence that the trial court could rely on to infer knowledge? Absolutely. It was admitted without objection. So a defendant can object to it now. And the flight is always, you know, you can always draw an inference of consciousness of guilt from flight and guilt of what? Well, the defendant can always argue it was I was only guilty of some lesser crime. But that's a question for the fact finder. And here he didn't he didn't just run. He fled the country. And I believe he was picked up two years later. He knew this was serious. He knew what he had done and he knew he had killed somebody. He had killed somebody. Right. Well, he knew how arguably in the light most favorable to the state, he knew how culpable he was. He knew it was murder. He was on notice of how much damage he was causing to this victim who was not responding in any way to his punches. I know that he didn't offer any aid, but I just want to point out he was actually forced to or told at least to leave. So he didn't really get a chance to offer any aid. But you talk about how he didn't do that. Does that make this case sort of different from Lanyell? I know that earlier you heard Justice Hyman tell Mr. Madden that Lanyell is totally different from this case. Do you also believe it's totally different? And then tell us why. Give us some of the reasons why it's different. It is. So, yes, one of the things is Lanyell. The defendant did render aid. He called 9-1-1 for the victim. It was also a little bit closer to a mutual combat situation. The victim testified or the defendant testified there. And he said the defendant had him by the shirt. And then he only started punching him to get away from the victim. So it wasn't a blind siding or a sucker punch situation. It was more of a mutual interaction there. And the victim did not appear to be immediately seriously injured. He, in fact, broke down the defendant's door after the punching and asked him to call 9-1-1. And then, of course, in Lanyell, the death wasn't a direct result of the punching. This was because he got increased blood pressure from the stress. He had a stroke. He died several days later. Here, the M.E. testified this was a direct result of the punches themselves internally decapitating the victim. Is it your argument that the force, speed and location of the punches is equivalent to exceptional violence here that would bring it in within the statute? If we're talking about, you know, an exception to the bare fist rule, our primary position here is that there is no extra burden that the people have to satisfy here just because it was a punching case. It's the same sufficiency standard in every other case. But if this court were to conclude that there's a bare fist rule, you know, we would certainly fall within some sort of exception. This is extreme force and violence based on the M.E.'s testimony comparing it to a car accident and the internal decapitation. And it's also a case of a vulnerable victim that's comparable to where the victim is much smaller than the defendant. And here he was larger, but he was vulnerable in the same way because he was caught unaware and had no chance to respond to the punches. And so, you know, if we look at it in terms of a rule with exceptions, there's certainly a number of exceptions that would apply here. Just one other factual question. There was a question about how many punches. I think the confusion is in Garza's testimony. He was asked on cross about each specific punch. I believe when he was asked about punch number two, he was asked, which hand did you hit him with? And Garza said both. And the attorney said, oh, so boom, boom. And he agreed. So essentially, I think what he said was punch number two was really a one two punch. So depending on how you count them, you do get to five, especially viewing evidence in the light most favorable to the state. Unless there are questions, I'd ask the court to affirm for the reasons stated here and those in the brief. Thank you, Ms. Stutz. Mr. Madden, your rebuttal. Thank you, Judge. Just on a couple of issues touched on by the state. Your Honor, a reasonable fact finder has to apply the law and it needs to find all every element beyond a reasonable doubt, including knowledge. You know, perhaps the most telling example that the trial court did not properly apply a reasonable doubt standard as to knowledge. Was that the preacher? Excuse me, the post-trial motions hearing the trial court stated, quote, did he mean to kill the guy? Maybe not. Maybe do great bodily harm, however, unquote. With all due respect, that comment should be an absolute red flag to this court. Maybe do great bodily harm, however. Judge, that's a that's a far cry from the required state proved beyond a reasonable doubt defendant had knowledge that his actions would cause death or great bodily harm. A far cry from that. Maybe do great bodily harm. Just to be clear, you're quoting the trial court's ruling. Maybe he did great bodily harm. Yes, Your Honor. Is that is that is that it? Is that the exact quote? The exact quote is, did he mean to kill the guy? Maybe not. Maybe do great bodily harm, however. And judge, that's at the record of three, three, six. And judge, maybe do great bodily harm and practically certain to do great bodily harm, which is what the Jones standard is, are not the same thing. The trial court fell way short of finding the requisite knowledge. You're on a reasonable doubt for finding a first degree murder. Judge, just very briefly as to the state's argument that other multiple exceptions that this would fall into and under the case law. Which one? Because we didn't hear which one. I still haven't heard which one. It doesn't fall into an exception unless there's a new exception. And if I could just address the flight, the flight evidence, the state misinterprets this argument regarding the defendant's flight from the country after the fact. The problem, it wasn't a problem with the admission of it. The admission of it is fairly benign if it's used properly. That's not what the argument is. The problem is, is with how the evidence was improperly utilized by the court. The trial court relied on that, on the flight evidence after the fact, to buttress its finding that the defendant had the required mental state to support a first degree murder charge. Plain and simple, this leap by the trial court was not only improper, it's illogical. Stavrila's mental state when he left the country and he knows the victim's debt is totally irrelevant to his mental state immediately prior to and during the act of throwing the punches in this case. There's nothing that can be inferred or should be inferred by the flight evidence. But the court did. When this was pointed out to the court at the post-trial motion hearing, the court doubled down on it, on the use of the flight evidence. And the court said, quote, I can infer his mental state, unquote, by the flight evidence. And that's just not, that's not right. And if that came into the... Isn't it right? Why couldn't the trial court have drawn that inference? Because... As a factor within all the many other factors that led to the trial court's conclusion here. Well, the issue of what knowledge needs to be proved beyond a reasonable doubt, the relevant knowledge is right before he does it and while he's doing it. It's not three days after he does it. At that point, he knows he's dead and he flees. You cannot impute anything from the flight to a knowledge of what his knowledge was, what his intention was directly before the punches and during the punches. It just, it doesn't, one doesn't equate to the other. That isn't the case law, though. Cases have said over and over just the opposite and that when somebody flees after an incident of murder, it's an indication of guilt. And that's exactly what the courts have done. And so you're saying we should throw out all those cases? Not at all, Judge. I would agree with you if Mr. Stabile's position was, I didn't punch him. That's not his position. Those cases I'm citing don't say anything about his position. They say the act of flight after murder or a criminal incident may be indicative of guilt. Well, Judge, I don't know how one draws an inference of knowledge before an incident and what the mindset would have been three days later when he knows the person's dead. So you're saying that all those cases, we should reverse them? Judge, I totally disagree that that's what I'm saying. That's not what I'm saying. What I'm saying is if his defense was I didn't punch him, that would be, you would be exactly right in pointing this out. However, that's not the position. The only issue with the knowledge is not whether he punched him or not. The issue is what he knew the likelihood of the result would be. That's it. And what he does three days later is not relevant. I'm sorry that for my view, it just isn't. And it's I'm not asking you to reverse anything. And I think what you're asking. Well, wait a second, Mr. Mr. Matt, you're saying you're not asking us to reverse anything, but that's how you end your brief. You're asking us to reverse the conviction of a man for a new trial. Now, I assume that that's based upon what you consider to be some of the errors during the trial. Right, Judge? Just to be clear, I'm asking the court to. Yes, I'm I'm asking the court to overturn this conviction of first degree murder and sufficient sufficiency. Well, that's what a reversal. That's what a reversal is. I'm sorry. I was I was I meant to say overturn. I was not asking the court to overturn precedent. No, I know. I'm just simply stating what you say in your brief that you're asking us to reverse the conviction. Correct. Correct. Remand for a new trial based upon the errors in this trial. Is that correct? Judge, that is not asking for a remand. You're asking for outright reversal. No, just a second. I want to walk him through this because I'm aware with this. So just just tell us what you're asking since since we you don't want to agree with what I'm saying. I'm simply saying that and I'm not I'm not going to stop there. I'm just making sure that that's part of what you're asking for. Right. Yes, we were asking for the court to overturn the first degree murder conviction. And if the court finds that these fall into the reckless acts of involuntary manslaughter, then that's what the court finds. But that that's what we're asking for. So. OK. And so if we then so because if we find that the state failed to prove knowledge, that's something different. That would either be in some cases it would be an outright reversal. But in this case, we could actually find that he was guilty of a lesser included offense such as involuntary manslaughter. I think that's correct, Your Honor. OK. And so my question is to you, tell us what. So you're asking us to to to do is that you don't say that in your brief. You just simply ask for anything that we believe is equitable and appropriate in terms of relief. So I'm asking you what you're actually asking us to reduce this to the lesser included offense of involuntary manslaughter. Is that correct? That is correct, Judge. OK. And now you're asking us that based upon, you know, your argument is that the state did not prove knowledge. Yes, Judge, which which given the state of the evidence, I think the state could have proved involuntary manslaughter. I do not think they can prove knowledge as to first degree murder. Well, when you say that, I think they could see that you're really saying you don't think that they did because the whole could thing, we're past that. I think they did prove it as the involuntary manslaughter. Again, we're talking about knowledge. So you believe that they did prove knowledge. Correct. I mean, that they did not. I'm sorry that they did not prove. That's correct. Right. OK. Involuntary manslaughter doesn't require that proof of knowledge. I realize that. So therefore, if they didn't prove knowledge, then we could still find him guilty of involuntary manslaughter. Absolutely. That's why I'm trying to take you just to understand what you're asking us for. But you seem to want to you seem to think I'm putting you in a trick bag or a trap or something. Judge, I think I'm asking the court to reduce it to involuntary manslaughter from first degree murder. OK, right. You don't say that in your brief, but I figured that that's what you were asking for. You simply ask us to do anything that we believe to be equitable and appropriate. OK, I believe that any more questions of Mr. Madden by the panel. OK, Mr. Madden, thank you. Thank you, counsels, for your zealous advocacy this afternoon on behalf of your clients. The case is submitted and the court will issue a decision in due course. Thank you, Your Honor.